Arguments not to exceed 15 minutes per side. Mr. Lamping for the appellant. I ask to reserve two minutes. You may. Thank you. Thank you, Your Honor. As I begin, I want to thank you for moving the hearing date to today. I appreciate that note of inconvenience. This case involves product liability action out of Michigan, and it focuses primarily on the Michigan Risk Utility Test. The Risk Utility Test is defined with six elements. Henri Line Machine Tools made a motion for summary judgment in which they challenged two of them, and only presented any actual argument and evidence on one of them. The elements that they talked about were the severity of injury, how foreseeable that was from this type of machine that's involved in this case, and the other element that they challenged was the likelihood of occurrence of an injury from this kind of machine. The machine that's involved in our case is an overhead gantry milling machine. It's a type of metal milling machine, and you really have to see it to get a good mental picture of what we're talking about here. It's a machine that's longer than this room. It's not quite as wide, but it has a huge gantry that goes on tracks that move up and down a big parallel, or two parallel tracks that cover the main bed of the machine. Suspended from this kind of U-shape over the tracks is the milling head of the machine. This is where all the cutting takes place. In this sense, it's not dissimilar from a standard milling machine in that it has a cutting head. A conventional milling machine, I don't know if any of you have worked in factories, but a conventional milling machine is sort of like a drill press. It sits in one place, and you have a table that you move around while the cutting tool stays in one place. This machine does the opposite. You take the part that you want to machine, and you fix it in place very rigidly, and then the machine moves all around it. It has a head that can cut in all different directions. You can change the kind of heads. The operator is standing on a platform that moves with the machine. The way that he operates the machine is he, at least at Lincoln Park Boring where this machine was, he programs in codes, a set of codes to do a short computer program. Hits the button that says start, and then the machine interprets those codes and then runs that machine program for as long or as short  These kind of machines are also used in a different sort of idea where they're completely computer controlled. Where someone can stand back, not even in the factory floor, send the codes in, and the machine will make different sorts of cuts. Usually these are kind of sweeping cuts. If you think of running an etch-a-sketch with your hands, it's easy to make vertical and horizontal moves, but if you want to make a diagonal move, it's really hard. You can't almost do it by hand. Is there a difference between the probability of an occurrence of an accident and the likelihood of the occurrence of the accident? That's really the focus of the case. I'm trying to understand it. Your expert said that he couldn't estimate a probability. Correct. Then he came back with an addendum and he never used the word likelihood, so I'm confused. His addendum actually does talk about likelihood of injury and actually uses the word probability, too, because he's using in his addendum the protocols that were set forth in ANSI standard B11-TR3-2000. What it is is a set of harm and injury from an industrial machine. It actually uses terms like likelihood of injury, probability. You're talking here about the matrix, which then leads to an answer, you might say, like low or medium or something. Low or medium or high. That's what you at least would call the likelihood of occurrence. That's right. That's what is standard industry way of doing it. You say it's a standard industry way. Do you have any cases that have accepted that as an acceptable way of meeting the standards for a FASCI case that says, effectively, I have no idea what the number is, but I'll use a word like negligible or low, because as I understand the standard, it's not how great or how small that likelihood is. It's whether the likelihood is foreseeable. Isn't that fair? That is, the standard doesn't turn on is it .1 or .001. It turns on whether is that likelihood foreseeable to the company that's putting the machine out there. Obviously, there are some kinds of things for which a very small risk is unreasonable. There may be other machines for which a reasonably large risk is still reasonable because it's the only way to do it. I understood the reason the law is taken the way it is, is that you have to at the risk. Am I wrong on that or is that fair? We have to assess the risk. Foreseeability is the key issue. In the definition of the risk utility test, it has to be that the likelihood of occurrence is foreseeable to the manufacturer at the time the machine is built. That's the test. We're saying that the foreseeability is there because this kind of machine and the kind of accidents that can happen from this machine are the same kind of accidents and injuries that happen with all kinds of milling machines. Almost every kind of milling machine or industrial equipment that has a turning shaft or a cutter head. Doesn't it seem that in fact, even including this one, that the proportion probability of other machines. First off, it was zero until this accident. Now you have what, 500, 5000 years of experience and one accident. When he tries to go to the SIC 33 of all types of 35 industrial machinery and equipment, that's rather a different ball game, isn't it? He started with that particular SIC code, but he looked for certain kinds of injuries and incidents that involved rotating shafts and failure to lock out and guard energy, which means guarding. He didn't take every kind of accident involving industrial equipment. That's one part where we did compile those kind of statistics and show here's how many accidents there are with these kind of comparable features that are the injury causing part of our machine. I guess that's the question of, is it fair to try to do that if by analogy you're comparing all motor vehicles with tanks or 18 wheelers or something of that sort? That's a distinction I want to focus on. Give it a try. If the kind of accident you're talking about is the wheels falling off your vehicle, then it's the same for every kind of vehicle that's got wheels. If you're talking about the faulty design of a bearing in the axle, every kind of vehicle that's got a bearing that's similar to that is something that you can look at as giving you information about how likely this occurrence is to happen. And that's all we're talking about. We're not talking about saying that because the wheel fell off a tank that that means that all the 18 wheeler But wouldn't you look I mean the type of injury that we're concerned about has to do with the operator's contact with the point of operation. So isn't the manner of I would think that you couldn't lump together a drill or a grinding machine or different types of machines based upon the cutting tool only if one machine is operated by somebody who's standing there inserting the raw material operating it and another machine is operated by someone who is 12 feet away. To me you would need more than the fact that they are both using the same cutting tool. We have to focus on the mechanism of how the injury happened in both of those situations. The what? The way the actual injury happened. How did the person get hurt by this machine? You're talking about someone feeding parts into a punch press. I'm saying that you could have two people who had a limb cut off by a certain type of machine, a certain type of cutting edge and the one person works in continuous proximity to that cutting edge and the other person works in another room and I would think that those that you don't say how often do people get cut by a cutting edge. I'm trying to address your argument here. The person that's in a different room is obviously going to have much less opportunity to get caught by this machinery. But if we're talking that they both had accidents and both lost their arms and somehow they did come in contact with the machinery. Trying to follow through on the example you're giving me. If someone's standing right next to the machine all the time. But the manufacturer of the machine where the operator is generally 20 feet away and the machine moves is much larger and moves at a much lower pace. Is that manufacturer supposed to evaluate the risk by looking at injuries that are sustained using this other machine? I'd say yes and this is why. If you have to get close to this machine from time to time, you're exposed to the danger. This machine requires the operator to go out on the bed of the machine while it's cutting the metal. To do different tasks here it was using air gun to spray away the debris that's generated by the cut. They know he has to be there. The machine requires him to be there. There's no other way to get it done. But then the question is how do you evaluate that likelihood? As I understand the numbers from ALFLEX study and don't hold me to the exact numbers, but as I read them there's been something like 500,000 hours they compute of men being out on the bed and this is the first time this has happened. So if you're the manufacturer and nothing has happened in 10,000 hours and nothing has happened in 20,000 and 50,000 how can you say that there is a likelihood that is foreseeable? Or how would you put it the other way around? What was the likelihood that was foreseeable? The likelihood is that if you require your operator to stand next to the operating cutting tool that sooner or later someone is going to get hurt. So from your view the likelihood is simply something greater than zero? What I'm saying is using the ANSI standards Well what you call the ANSI standards you come up with an answer that is low or negligible or medium or some name. No, it says it's high. That's if you input the very likely sign. But whatever it is, because again my understanding of the law is the law doesn't depend on how big the number is, it's how foreseeable. So at least from my point of view if you have a good case it would be just as good if it were low rather than high. But that is your statement. The likelihood that is foreseeable is that name from that grid. Not a number but a name. Is that right? That's one of the two methods. I think both of them are suitable. I think your time has expired if you want to keep your rebuttal time. Thank you. I think the panel has essentially found the issue here that you cannot compare this machine to any other. The size of the machine, the functions it performs, the manner in which it moves. Why doesn't that go to the design feasibility as opposed to the nature and likelihood of the danger? It seems to me that you have this machine, it has this exposed cutting surface. Somebody will be in, although not constantly, part of the way it functions is that you clean the area off and it seems to me to be very obvious and very foreseeable that somebody might be exposed to that cutting surface and be severely injured. And that if you want to talk about why you can't have a lockout or why this or why that then you're talking about the design feasibility as opposed to the likelihood or probability of injury. I think I partially agree with what you're saying. Obviously it is a design feature. Mr. Jett testified when they were going through their risk analysis or risk assessment that they looked at whether or not they could use some of the guarding mechanisms that were suggested and they determined that they would impair the functionality of the machine itself. So as far as can we design this out of the machine, no we can't and have it still function the way it's supposed to be. But that's not the basis upon which you prevailed. But I think it's part of the analysis because the first element is whether or not the severity of the injury was foreseeable. The second is what we prevailed on and it's the likelihood of the occurrence. So when we get into the likelihood of the occurrence you need to look at and that was Mr. Hofflich's calculation is given the number of hours this machine operates and the number of machines that are in use and the number of hours per week and weeks per year and then you take all of that to get to the number and then out of that what is the percentage that they're actually exposed to risk and that's where plaintiff's expert fails because he testified that he did not make any determination about the amount of time the operator of the machine had to be out on the operator's platform. He doesn't know what they were doing out there. He doesn't know how long they were out there. He can't say the amount that they were exposed to that risk. He essentially equates any exposure with 100% exposure and that's not the analysis. Going back to the matrix whether it's likely or minimal, if he's out there 2% of the time and he's only exposed to this risk a minuscule part of that percentage that he's actually on the platform, that's the risk that goes to the likelihood of an injury. What if somebody is, what if you have this grave, grave, grave risk that is encountered once every 5 years when a certain procedure needs to be done but chances are you're going to get injured. Then you get into how do you protect against this risk and there's the hierarchy of what you go through and can it be designed out of the machine? The answer here is no. That's a difference? I don't think it is your honor because you're asking what do you do if there's this minuscule risk of a tragic incident and how do you guard against that minuscule risk? Well that's where you get into the first line of defense is you design it out of the machine. That can't be done. The second line is you use guarding and the testimony in this case is that guarding. You didn't prevail on that. You can't argue that here. You didn't you did not win on the basis that there's no genuine issue regarding whether you could design the risk out of it. You won on the basis that the risk was not sufficiently foreseeable. So we have to talk about that. I apologize I was trying to respond to your question because part of your question related to how do we handle this minuscule risk that they're exposed to, this minuscule risk that's a severe injury. I think we mean handle in the legal sense not handle in the engineering sense. Because here you didn't win on engineering. No. Let me ask you about this matrix. Do you know either from your practice or from any cases where this kind of matrix analysis has been accepted as meeting the second factor of foreseeability of likelihood of occurrence? I'm not aware of any and I would just add that I don't think that it was properly applied given his lack of information about the way the machine functioned. Well, although given that it's not numerical, it's all wording, I'm not sure that I take that on either side because if the matrix is acceptable, does it matter whether the outcome is low or medium or high? Because isn't the whole point of that factor is some prognosis that's foreseeable? I think there's a distinction there. Whether or not the injury is foreseeable is different than the likelihood of the occurrence. The likelihood of the occurrence is the calculation that Mr. Ofleck did. The foreseeability is whether or not you can foresee somebody being on this bed being injured. That's the first element. Do you agree that you can? The district obviously argued it's an open and obvious risk. So the claim is precluded because it's open and obvious. So yes, it's foreseeable, but that doesn't answer the likelihood of occurrence issue. And the likelihood of occurrence is based on given the nature of what that person is doing, how likely is it that they are going to be injured? But in order to meet it as factor two of the prima facie case, would it matter whether it was one in a thousand or one in a hundred thousand or one in a million as long as you could in fact foresee it? That's what I've been trying to get either of you or both of you to respond to. I think it actually does matter because the fact that otherwise you've equated foreseeability and likelihood and basically turned the first two elements into a single element. Because if it's negligible... The first element, and maybe we're tracking different numbers, but the first element is the severity was foreseeable. The second is the likelihood of occurrence was foreseeable. So severity means if you get in the way of this cutting head, you're going to be mangled. And the judge says they've met that one. And you're not disputing that at least at this point. So we're back to just number two, that the likelihood of occurrence was foreseeable. And maybe I'm simple minded on this, but I read that English to be, I'm not real interested at this stage in how big that number is. That's what I said, one in a thousand, one in a million. But it's whether it's foreseeable at all. That some weighing of it, weight of it. And that's your best case, which is there never had been an injury. So it's very hard to foresee the likelihood. And of course you don't want to say every so long that I thought that was your best side of it. That's why I'm saying trying to either get people to tell me to agree or disagree that the magnitude of the likelihood isn't what's important, it's whether it's foreseeable or not. I don't disagree with what you're saying. The part I'm struggling with trying to, is because my response is going to go back to whether or not this is something that you can eliminate. But isn't Judge White completely correct? That's a different stage of the process. That's not what Judge Cook ruled on. You may be innocent as the driven snow at the end of this process, but in order to win this appeal at this stage, you have to eliminate the likelihood. That's not what Judge Cook ruled on, don't you? I agree, but I think if you read Judge Cook's opinion, he clearly didn't equate a likelihood of occurrence being foreseeable as any percentage. Because obviously, even Mr. Alflick's calculation of 1 in 10 million, there's some foreseeability there that this occurrence could happen. He's only able to develop that number after this accident happens. If you had asked him to give you a report in advance, which is the time that they made the machine, he wouldn't have been able to have the data to make that answer. Judge Cook, in ruling on this motion, and in looking at his opinion, he did not view it in the same manner in which you are approaching it right now. So what do you do when you have a fairly new product? I mean, how do you, if you need accident experience to be put on notice, how do you evaluate it? Again, you go back to the risk assessment, which is what you don't want me to talk about, because you've cut me off before. That's right. But there's a different element, which is foreseeability. I mean, how do you, well, let's put it like this. Let's say that they hadn't had this experience of no injuries, and you were putting this into service, and you looked at it, and you said, wow, that could be a really bad injury if somebody's hurt. We are going to have people around there cleaning. We should probably come up with something, because we don't know how human beings are going to behave around this machine. Well, the last part of that is what I would disagree with, because obviously they do know how the machine functions. It's a programmed machine. They know what tasks are going to be performed. They know how fast this machine moves and how slow it moves. They know how this machine functions, and whether or not there's the likelihood that this incident, or a incident, is going to occur. And that's where plaintiff's expert completely misses the mark, because they didn't do any of that analysis. They simply said, there's a rotating spindle, therefore there's a likelihood of injury, and that's the end of the case. And my point, if you look at the machine itself, and you have to look at, this is not a fast-moving machine. It is a machine that's programmed by the operator. The operator knows the functions that are going to be performed. It's used by an experienced machinist. All of these things are known, and basically indicate that it's... But most accidents are due to operator error. Yet, we know that you have to design for them. To design in anticipation of that. Right? If you can design it out. We keep coming back to the same spot here. But again, from the manufacturer's perspective, they're looking at the functions of this machine, and the way that it's operated, who it's operated by, the manner in which it's used, and obviously, all of those things, and this wasn't the first machine. These machines are unique in character. They've been in the business for a number of years. They had no prior history of any type of accident. So, there was no... The likelihood of the occurrence wasn't foreseeable to them, given their understanding of what was to be done, the manner in which it was done, and their past experience on how things had been done in the past. And then just the last point, as far as plaintiffs talking about other incidents that really aren't similar, their expert didn't look at any of the facts or circumstances of it. In order to support the claim that this was somehow foreseeable, they need to have similar circumstances. They didn't look at any of the circumstances. They just said, if there's a rotating spindle, then it's the same, and nothing else matters. And that's insufficient. And that is, in their brief, they mentioned that it's only a question of, an evidence question, if it relates to being offered for negligence rather than a design defect. We cited in our brief, Cooper v. Firestone Tire, which is 945F2-1103, 9th Circuit case, that indicates the showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as direct proof of both negligence and a design defect. And obviously this case deals with a design defect. I notice my time is up. I thank you for yours. Thank you, Counsel. You'll have your time for rebuttal. Thank you, Your Honor. I wanted to answer your question, Judge Boggs. I did cite a case that talked about the ANSI risk matrix standard. It's in our brief, Thomas v. CMI-Terex. It's a district court case out of New Jersey. What I wanted to point out was the matrix of that standard, we're not just plugging these things in randomly. What's defined as likely under probability of occurrence of harm under Section 7.3 is that it may occur. What are you reading from now? My ANSI TR, or B11 TR 3000, Section 7.3, it actually goes through how you determine the probability of occurrence of harm and how it's defined by industry standards. What they say is you use the likely or very likely or unlikely or remote likely. They define each of these. Likely is defined as may occur. It's a variation on Murphy's Law. But is that, does that override the Michigan cases that talk about, in most cases repeatedly, evidence concerning the magnitude of the risk of how likely it is that to me, I say we may just have a difference of opinion. That requires something more than just kind of broad terms like low or negligible. Actually, they address this peripherally in Reeves v. Cincinnati, a Michigan case. It's 439 NW 2nd, 326. I know, I've got the case. And there, well, it may be different pages. It says a safe due to a product defect, which sounds a lot more like wheels are falling off cars repeatedly. Well, there it's a power press case. And they're saying power presses are known to have this problem of unintentional cycling in general. So there was a lack of guarding on this particular case. And at least in that case, the person, if you had a power press that was in the general run of what the industry used, you would have a pretty good case, right? Because this particular kind of general machine cycles accidentally, right? Right. But they're saying that's a general characteristic of power presses. I'm saying a general characteristic of milling machines is they have cutting tools. And that's the danger that we have here. And that's the same analysis, I think, as they talked about in Reeves. Is there a general kind of danger? Has the plaintiff produced evidence about that? That's what we think we have presented. And this actually ties in with the point that you were talking about, Judge Wade. What do you do with a brand new product? Or a rare product, in this case. You've got to compare it to other similar products that have similar hazards. And that whole process of comparing certain kinds of machines to each other is also right part of the ANSI standard and a whole bunch of government standards. If you've got a brand new machine, you hire someone to do the analysis, this is how you do it. You compare it to other machines and you figure out how likely is it that someone's going to be somewhere where they can get hurt and how can we fix that? In that Thomas case, I have not read it, you say it adverts to ANSI standards. Does New Jersey law have the same factor? And in the case that you're referring to, did it use this matrix analysis where he comes up with a word? Yes, it used the matrix analysis. I'm trying to remember. I think New Jersey allows strict liability. New Jersey's usually much more liberal than most any other state, at least. That's what I learned in law school. That's what I'm thinking too. But the whole point of the analysis in that Thomas case, what it had to do with likelihood of occurrence. That's what the whole analysis was about and it goes on for several pages. It goes into real depth into why this is a good way, or is an acceptable way for the plaintiff's expert to judge. Let me ask you this. Another, Reeves is one of the people in Miller v. Ingersoll-Rannett says the burden on the plaintiff is to produce, and I'm quoting at this point, proof sufficient for a reasonable jury to balance the magnitude of the risk versus the feasibility of other design alternatives. And that's the reason you have this factor, is because you have to allow the jury to balance the magnitude of the risk. And I guess you're saying that low, high, and medium is enough of a magnitude for the jury to understand? Yes. Okay. And it's used by the industry for exactly that purpose. Okay. Any other questions, judges? So you're saying it's not, you're saying none of these are factors that you look at by themselves that would determine the elements of the risk utility test? Yeah. Is that what you're saying? No, I'm saying just for purposes of coming up with likelihood of occurrence of whether you're going to get an injury out of this machine, it's reasonable to look at similar machines with similar qualities. It is one way of getting the data that you don't have on a brand new machine. Okay. I mean, yes, the machine moves slow, but steamrollers move slow, and every year people get run over by steamrollers. I mean, it's just, that's not what's determinable. This guy got his clothing caught up in his cutter, and then it drilled through him. That's a query. I've now gone back to the part of your brief, and I haven't read the whole opinion, but your analysis of it seems to go to admissible, or your statement as to what the court had in front of it was about admissibility. The Thomas court said it may be an excellent tool for cross-examination, but does not preclude admission of the expert testimony. So it doesn't sound as though it had to do with whether it met a Michigan Factor II kind of test. Is that probably a fair, I mean, I'll read it definitely. The Thomas case was a Daubert challenge. Yeah. Plaintiff's expert, whether it's acceptable to use this as a way to come up with rights. And at least at this point, we're not accepting their view that we can't even look at your expert because Judge Cook looked at it, but said it didn't meet it. Okay. I think we've got it, unless either colleague has another question. Thank you. The case will be submitted. Clerk, may adjourn court.